IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID E. CLESTER, | ) | CASE NO. 5:25-CV-02793-JRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, David Clester ("Plaintiff" or "Clester"), challenges the final decision of Defendant, Frank Bisignano, Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In June 2023, Clester filed an application for POD and DIB, alleging a disability onset date of May 26, 2023, and claiming he was disabled due to major depressive disorder, generalized anxiety disorder, panic disorder, attention deficit hyperactivity disorder, and hypoglycemia. (Transcript ("Tr.") 15, 100.) The application was denied initially and upon reconsideration, and Clester requested a hearing before an administrative law judge ("ALJ"). (Tr. 15.)

On April 29, 2025, an ALJ held a hearing, during which Clester, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On June 18, 2025, the ALJ issued a written decision finding Clester was not disabled. (*Id.* at 15-37.) The ALJ's decision became final on October 29, 2025, when the Appeals Council declined further review. (*Id.* at 1-6.)

On December 29, 2025, Clester filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 6, 8.) Clester asserts the following assignment of error:

> (1) The ALJ improperly omitted specific limitations opined by the Agency's own experts without adequate explanation.

(Doc. No. 6.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Clester was born in May 1961 and was 63 years old at the time of his administrative hearing (Tr. 15, 35), making him a "person of advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(e). He has at least a high school education. (Tr. 35.) He has past relevant work as a training manager. (*Id.* at 34.)

### B. Relevant Medical Evidence[1]

On April 25, 2023, Clester saw Theodore Saslow, LCASA, LCMHC, for a mental health assessment and reported that he was taking medication for his depression and anxiety, but the medications were not working. (*Id.* at 458.) On examination, Saslow found Clester fully oriented with normal eye contact and

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. To the extent Clester cited to large portions of the record without identifying specific facts on specific pages (*e.g.*, "Mr. Clester has been receiving treatment at Summa Health in Akron from January 2024 through March 2025. Tr 54, 593-675.") (Doc. No. 6 at 4), in contravention of the Court's Initial Order (Doc. No. 4), the Court does not discuss this evidence.

normal speech. (*Id.* at 459.)

On May 25, 2023, treatment providers admitted Clester after he went to the emergency room with suicidal ideation and a plan to overdose following his "recent separation and impending divorce." (*Id.* at 402.) On examination at discharge on May 31, 2023, treatment providers found a cooperative attitude, a "good/happy" mood, full range of affect, normal speech, good eye contact, normal thought content, a logical, goal-directed thought process, adequate attention/concentration, and good insight and judgment. (*Id.* at 405-06.)

On January 8, 2024, Clester saw Joshua Magleby, Ph.D., for a consultative psychiatric evaluation. (*Id.* at 576-583.) Dr. Magleby noted that Clester arrived with his "service dog." (*Id.* at 576.) Clester reported that he struggled to comprehend and remember things, and he was "intimidated by certain people, especially those in authority." (*Id.*) He told Dr. Magleby that his relationships with his coworkers "were usually 'good'" and his relationships with his supervisors were "'good'" throughout his work history. (*Id.* at 577.) Clester endorsed periods of depression where he did not want to get out of bed, he did not eat, he experienced dark thoughts and feelings of worthlessness, hopelessness, and/or helplessness, he may withdraw from others, he struggled to make decisions, and he lacked motivation/interest in things. (*Id.*) He also experienced job-related anxiety and occasional "panic-like symptoms" that consisted of lightheadedness and difficulty breathing. (*Id.* at 577-78.) Clester reported being uncomfortable around the public and described himself as shy and introverted. (*Id.* at 578.) He stated he had a distrust of people that he had experienced since he was in his 20s. (*Id.*) Clester lived with his parents and reported "somewhat limited" daily activities; however, Dr. Magleby noted that "[l]imitations or restrictions due primarily to psychiatric conditions are generally minimal." (*Id.*) Clester described "somewhat limited" social activities that consisted of spending time with his parents and a close friend. (*Id.*) Dr. Magleby noted that "[g]etting along with friends, neighbors or peers appears at least somewhat limited." (*Id.*)

On examination, Dr. Magleby found appropriate eye contact, appropriate behavior, linear and future-oriented thought content, "mildly aphasic" word finding but otherwise normal speech, a stable mood, a "somewhat restricted" affect that was congruent with Clester's mood, "somewhat restless" psychomotor activity such as fidgeting and occasional rocking, average sustained attention, average to low average estimated intelligence, "perhaps mildly limited" judgment, and "fairly adequate" insight. (*Id.* at 579-80.) Dr. Magleby diagnosed Clester with social anxiety disorder, generalized anxiety disorder with panic attacks, persistent depressive disorder with melancholic features, and borderline personality disorder with paranoid and dependent traits. (*Id.* at 580.) Dr. Magleby opined that Clester's ability to relate to others "has been at least somewhat impaired," but noted that Clester's ability to relate socially during the consultative examination was "more than adequate overall," although Clester showed "some signs of anxiety" during the evaluation. (*Id.* at 582.) Dr. Magleby further opined that Clester's ability to withstand workplace stress and pressures seemed "to be at least somewhat impaired at this time by several issues including generalized and social anxiety, panic attacks, maladaptive personality traits, and seemingly moderately severe and persistent depression symptoms." (*Id.*)

On April 19, 2024, Clester saw William Cayuso, M.D., for follow up regarding his depression, anxiety, and ADHD. (*Id.* at 619-20.) Clester reported "significant improvement" of his mental health symptoms since starting Vyvanse, although Clester wanted to try adjusting his dose to achieve better symptom control. (*Id.* at 620.) Clester told Dr. Cayuso he continued to experience moderate anxiety with "symptoms concerning for agoraphobia," but stated that his anxiety symptoms were "'manageable.'" (*Id.*) Clester denied mood dysregulation, including depression. (*Id.*) Clester reported that he was "increasingly able to spend time with friends and family in a meaningful way that allows him to feel present," and he denied any panic symptoms since his previous appointment. (*Id.*) On examination, Dr. Cayuso found cooperative behavior and noted that Clester "engaged readily." (*Id.* at 623.) Dr. Cayuso further found

normal speech, restricted affect, logical and goal-oriented thought process, normal thought content, fair concentration, and good insight and judgment. (*Id.*) Clester's diagnoses consisted of generalized anxiety disorder, which was improving, ADHD, which was improving, and recurrent major depressive disorder, which was in full remission and stable. (*Id.*) Dr. Cayuso increased Vyvanse and continued Cymbalta, Wellbutrin, olanzapine, and clonidine. (*Id.*)

On May 31, 2024, Clester saw Dr. Cayuso for follow up and reported having "a 'rough month'" that included "intermittent struggles with depression and chronic, severe anxiety." (*Id.* at 627-28.) On examination, Dr. Cayuso found cooperative behavior and noted that Clester "engaged readily." (*Id.* at 630.) Dr. Cayuso further found normal speech, an "'anxious'" mood, restricted affect, logical and goal-oriented thought process, normal thought content, fair concentration, and good insight and judgment. (*Id.* at 630-31.) Dr. Cayuso discontinued lisdexamfetamine and substituted buspirone. (*Id.* at 631.)

On September 23, 2024, Clester saw Blair Bakula, D.O., for follow up and reported continued problems with anxiety and very little improvement on Buspar. (*Id.* at 647-48.) Clester told Dr. Bakula that social settings worsened his general anxiety. (*Id.* at 648.) On examination, Dr. Bakula found Clester "[c]ooperative, conversant, [and] engaged" with good eye contact, normal speech, a reported "'anxious" mood, a congruent affect, a linear, goal-directed thought process, normal thought content, normal perception, fair attention and concentration, and good judgment and insight. (*Id.* at 649.) Dr. Bakula discontinued Buspar, started Gabapentin, and continued Clester's other medications. (*Id.* at 649-50.)

On October 28, 2024, Clester saw Dr. Bakula for follow up and reported that he had been "doing well" and "ha[d] not experienced a lot of anxiety" since his last appointment. (*Id.* at 653-54.) On examination, Dr. Bakula found Clester "[c]ooperative, conversant, [and] engaged" with good eye contact, normal speech, a reported "'good'" mood, a congruent affect, a linear, goal-directed thought process, normal thought content, normal perception, good attention and concentration, fair insight, and good judgment. (*Id.*

at 655.) Dr. Bakula noted that Clester's anxiety and repression were "currently controlled with current regimen." (*Id.*)

On February 3, 2025, Clester saw Dr. Bakula for follow up and reported that his depression continued to be "relatively stable," although he struggled with loneliness that was worsened by his social anxiety. (*Id.* at 665-66.) Clester wanted to meet new people, but social situations caused him to become anxious. (*Id.* at 666.) Gabapentin helped his anxiety. (*Id.*) On examination, Dr. Bakula found Clester "[c]ooperative, conversant, [and] engaged" with good eye contact, normal speech, a reported "'lonely'" mood, a congruent affect, a linear, goal-directed thought process, normal thought content, normal perception, fair attention and concentration, and fair judgment and insight. (*Id.* at 667.) Dr. Bakula increased Gabapentin, decreased clonidine and Cymbalta, and continued olanzapine. (*Id.* at 668.)

**C. State Agency Reports**

On January 22, 2024, Matthew Wong, Ph.D., reviewed the file and opined that Clester had a mild limitation in his ability to understand, remember, or apply information and moderate limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 105-06.) Dr. Wong further opined that Clester could "carry out all levels of work in a setting with flexible pace and production requirements," "interact with others in the work setting superficially on an intermittent basis," and "perform routine work-related tasks in a predictable setting with infrequent changes in routine and responsibilities." (*Id.* at 108-09.)

On August 2, 2024, on reconsideration, Courtney Zeune, Psy.D., affirmed Dr. Wong's findings. (*Id.* at 115, 117-18.)

**D. Hearing Testimony**

During the April 29, 2025 hearing, Clester testified to the following:

- He lives with his parents, who are in their 80s. (*Id.* at 86.) He does not get out much. (*Id.*)

- He can no longer work full-time because his job involved doing research and it was difficult for him to do because "[his] mind would race all the time." (*Id.* at 80.) He has been diagnosed with ADHD, so he struggles to stay focused. (*Id.*) He also suffered from panic attacks and anxiety attacks surrounding his job. (*Id.*) He felt insecure in his employment because he had a hard time focusing. (*Id.*) This led to some of his depression. (*Id.*) He also felt "easily intimidated by leadership." (*Id.*) He became forgetful during one-on-one conversations because he felt intimidated. (*Id.*) These problems built up over time. (*Id.* at 81.) His job required him to travel to different branches, and that became his favorite part of the job because he did not have to interact with anyone while he traveled between the branches. (*Id.*)

- He takes medications for his mental health symptoms, and they help somewhat. (*Id.*) His treatment providers are still trying to find the right combination. (*Id.*) He continues to experience ADHD symptoms and anxiety. (*Id.*) Some of his medications make him drowsy. (*Id.* at 81-82.) He underwent counseling two years ago. (*Id.* at 82.) He talks to his psychiatrist now. (*Id.*) He sees his psychiatrist once a month or once every 45 days. (*Id.* at 84.)

- He was hospitalized for mental health symptoms in May 2023, but not since then. (*Id.*)

- He "tend[s] to be forgetful." (*Id.* at 82.) He would forget words when doing group training. (*Id.*) He gets anxiety/panic attacks three to four times a week. (*Id.* at 86.) He has had two anxiety/panic attacks in the past 45 days. (*Id.*) Some days are better than others. (*Id.* at 87.) He gets depressed to the point where he does not have the energy or the desire to do anything at least once a week. (*Id.*)

- He must read written instructions several times before he understands it. (*Id.* at 82.) He struggles less with verbal instructions because he can ask questions. (*Id.*)

- He has a hard time staying focused and on task because his mind goes in different directions. (*Id.* at 83.) He cannot read because he struggles to focus. (*Id.* at 86.) He has read two books in his entire life. (*Id.*) He cannot recall what happened during a TV show. (*Id.* at 86-87.)

- His parents must redirect him to do household chores. (*Id.* at 84.) He struggles to do the cooking, although his dad helps him stay focused on it and he can get it done with his dad's help. (*Id.*) His mom must remind him to vacuum. (*Id.*) He needs reminders to brush his dog. (*Id.*)

- He does not struggle to get along with other people, but he is easily intimidated by them. (*Id.* at 82.) He gets irritated easily, although he tries not to be confrontational. (*Id.* at 83.)

- He drives, and he can go grocery shopping if he has a list. (*Id.* at 84.) He gets "a little anxious" when the stores are crowded, so he tries to get in and out as fast as he can. (*Id.* at 84-85.)

- He likes target practice, axe throwing, and riding motorcycles, but he does not do these things because he is introverted and trying to go places where he can do those things on his own is hard for him. (*Id.* at 85.)

The VE testified that Clester had past work as a training manager. (*Id.* at 89.) The ALJ then posed the following hypothetical question:

> Please respond as to whether or not the hypothetical person could perform the claimant's past work, either as how he performed that work or that work is generally performed in the national economy. For the first hypothetical, please assume a person of the same age, education, work experience as the claimant. Person does not have any exertional limitations. Person is able to understand, remember and carry out simple instructions. Person is unable to perform fast-paced production rate pace work, for example assembly line work or jobs that require strict hourly production quotas. Person is limited to no public interaction. Person is limited to occasional interaction with coworkers and supervisors. Person is unable to perform tandem tasks. Person is limited to simple work-related decisions. Person is limited to occasional changes within a routine work setting. Could such a person perform the training manager job?

(*Id.* at 89-90.)

The VE testified that the hypothetical individual would not be able to perform Clester's past work as a training manager. (*Id.* at 90.) The VE further testified that the hypothetical individual would also be able to perform other representative jobs in the economy, such as packager, cleaner, and order picker. (*Id.*)

The ALJ had the following exchange with the VE about the identified jobs:

> Q Now, if I understand occasional correctly, it's a range from about zero, more than zero, I mean, you have to interact with someone, but. More than zero to up to a third of the workday. Is that right?
>
> A Yes.
>
> * * *
>
> Q Now, I'm wondering, you know, with the occasional could be up to a third. So, that's about two hours and 40 minutes a day. So, with these jobs, what I'm wondering is, is, is it intense? So, a person arrives at 8:00, are they intensely interacting for two hours and 40 minutes and then no interaction for the rest of the day? Or could you describe kind of how the, the interaction flow of these jobs you've given, how do they go from your experience well? [sic]

A There's, none of these jobs are tandem or require interaction with your coworkers. So, it could just be randomly throughout the day. Someone might say hey can you hand me that or can you help me with this or can you get that, that type of thing. It's not a [sic] amount of you must interact for two hours right now.

(*Id.* at 91-92.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled

regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Clester was insured on the alleged disability onset date, May 26, 2023, and remains insured through March 31, 2028, the date last insured ("DLI"). (Tr. 15-16.) Therefore, in order to be entitled to POD and DIB, Clester must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2028.

2. The claimant has not engaged in substantial gainful activity since May 26, 2023, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: depressive disorder, generalized anxiety disorder and social anxiety disorder, borderline personality disorder, and attention-deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is able to understand, remember, and carry out simple instructions, he is able to make simple work-related decisions, but he is unable to perform fast-paced production-rate pace work (e.g., assembly-line work or jobs that require strict hourly production quotas). He can have no public interaction, he is limited to occasional interactions with coworkers and

supervisors, but he is unable to perform tandem tasks. He is limited to occasional changes within a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May **, 1961 and was 62 years old, which is defined as an individual closely approaching retirement age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 26, 2023 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 18-37.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by

substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Clester argues that, despite both state agency reviewing psychologists opining that Clester could "'interact with others in the work setting superficially on an intermittent basis,'" the ALJ included "less restrictive limitations" into the RFC without "adequately explaining why" a superficial limitation was not included in the RFC. (Doc. No. 6 at 7.) Clester asserts that the ALJ also failed to "adequately evaluat[e]" the findings of the state agency psychologists in accordance with 20 C.F.R. § 416.920c. (*Id.*) Clester maintains that the ALJ's "legal error" in failing to "adequately explain" the omission of a limitation to superficial interaction with others is "exacerbated where the state agency expert's opinion was consistent with and corroborated by the opinions of the consultative examiner, Joshua Magleby, Ph.D. . . ." (*Id.* at 10-11.)

The Commissioner responds that the ALJ "did not err" in evaluating the opinions of the state agency reviewing psychologists. (Doc. No. 8 at 5.) The Commissioner argues that the ALJ "specifically rejected" a limitation of superficial interaction with others. (*Id.* at 6.) Moreover, while Clester "claims that the term superficial interaction can also not be replicated in a 'no tandem task' limitation," the Commissioner asserts that "this Court has held exactly that." (*Id.*) (citing *Duma-Quigley v. Comm'r*, Case No. 3:22 CV 917, 2023 WL 3016861, at *4 (N.D. Ohio Apr. 23, 2023)). Therefore, because the ALJ "accounted for such a limitation in any event," the Commissioner maintains that there is no error. (*Id.*) The Commissioner further argues that the ALJ complied with SSR 96-8p, as the ALJ "explicitly explained" why a limitation to superficial interaction was not being adopted. (*Id.* at 7.) While Clester claims—without citing any authority—that vagueness "is not a 'good reason'" for rejecting an opined limitation, the Commissioner

asserts that "once more, Plaintiff's assertion is at odds with reasoning used by this Court." (*Id.*) (citing *Baker v. Comm'r of Soc. Sec. Admin.*, Case No. 1:23-CV-01988, 2024 WL 3091042, at *10 (N.D. Ohio June 21, 2024)).

Since Clester's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[2] (2) consistency;[3] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

---

[2] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[3] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.
>
> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20

C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

SSR 96-8p provides guidance to ALJs on how to assess a claimant's RFC. It provides that a social security disability claimant's RFC is an assessment of the most a claimant can still do despite her limitations. SSR 96-8p, 1996 WL 374184 (July 2, 1996); 20 C.F.R. § 404.1545(a)(1). Though an ALJ must consider all medical and non-medical evidence, "[t]he ALJ is charged with the responsibility of determining the RFC." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). When addressing medical source opinions, SSR 96-8p provides that, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

In weighing and analyzing the opinions of state agency reviewers Drs. Zeune and Wong, the ALJ found as follows:

> On January 22, 2024, State agency PC Matthew Wong, Ph.D., reviewed Dr. Magleby's report of examination along with the other initially available medical evidence. Dr. Wong found that such evidence substantiates the existence of medically determinable mental impairments of anxiety disorders, depressive disorder, and personality disorder but that, while "severe," they do not meet or equal the listings and cause no greater than moderate limitations in three of the four "paragraph B" criteria, but only mild limitation in understanding, remembering, or applying information(Ex. 3A/6-7). Dr. Wong assessed moderately limited work-related mental abilities to maintain attention and concentration for extended periods, to perform activities within a schedule and maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. With such limitations considered, Dr. Wong found that the claimant would still retain the mental functional capacity to carry out all levels of work in a setting with flexible pace and production requirements, to interact with others superficially on an intermittent basis, and to perform routine work-related tasks in a predictable setting with infrequent changes in routine and responsibilities (Ex. 3A/9-10).

On August 2, 2024 review of the evidence at reconsideration, State agency PC Courtney Zeune, Psy.D., offered the same administrative medical findings, including Dr. Wong's articulated assessment of the claimant's mental residual functional capacity (Ex. 5A/3-4,6-7).

The State agency PCs' shared administrative medical findings for moderate limitations in three broad and specific work-related areas of mental functioning and, only in general respect to limiting effects on pace and productivity demands, frequency and type/quality of interactions with others, and changes in the work routine are **partly persuasive** because, in addition to having good supportability through their documented considerations of Dr. Magleby's January 2024 consultative psychological examination and included medical opinion, they are also supported by additionally available evidence via the claimant's response to the Function Report indicating fairly intact daily activities and social relationships with family members, the May 2023 psychiatric hospitalization for suicidal ideation, and the early follow-ups in outpatient (primary care and counseling) settings showing benefit to enhanced medication regimen (*see* Ex. 3A/4-5,7,8; 5A/4,5). In particular, they considered engaged behavior when interacting with his own medical sources in midyear 2023 and with Dr. Magleby six months later, not fully consistent with the alleged social anxiety, and the examining psychologist's mostly unremarkable mental status examination beyond serial-7s, not suggesting as severe an inability to focus and pay attention for the 5-10 minute span as alleged. Complementing supportability here, these aspects of the State agency PCs' findings remain consistent with the January 2024-March 2025 outpatient psychiatric treatment notes from Drs. Cayuso and Bakula in both objective mental status findings (as noted above, unremarkable beyond "fair" but at times "good" attention and concentration, and anxious to depressed mood and affect), fairly stable and conservative treatment via medication regimen, and the claimant's subjective reports for stable if not "controlled" depression, some anxiety but denying panic attacks at the strong majority of follow-ups, improved and "adequate" sleep at night, and improved ADHD symptoms for an initial period of taking psychostimulant medications (Concerta, Vyvanse) but then on anti-anxiety medications (Buspar and currently gabapentin) (*see* Ex. 8F).

However, the State agency PCs' articulated assessment of the claimant's mental residual functional capacity and finding only mild limitations in broad and specific aspects of understanding and memory functioning are **not persuasive**. For the latter, their otherwise on- point rationale from the available medical evidence does not adequately consider the claimant's mildly aphasic word-finding directly observed by Dr. Magleby or the subjective memory difficulties that bear out consistently in his reports in this application, to that examining psychologist, and to other medical sources. Accordingly, the undersigned has instead found moderate limitations in this first area of mental functioning and, in turn, has found the claimant only able to understand and remember, and to carry out, simple instructions.

> For the former, Dr. Wong's assessment is phrased in both unduly broad and nonspecific, not vocationally defined terms throughout, including the open-ended term "flexible" for pace and production requirements, and yet not limiting the claimant in complexity of work tasks ("carry out all levels of work"), "superficially"[2] interacting with others and "on an intermittent basis," and a "predictable work setting with infrequent changes." In short: since these terms are broad and not vocationally defined, they do not adequately articulate the claimant's maximum remaining work-related abilities on a sustained basis and, as such, lack supportability.
>
> Accordingly, the undersigned has used more specific, vocationally defined, and policy compliant language to articulate the moderate limitations arising from the claimant's mental impairments in this Finding of residual functional capacity, with superficial quality of interactions accounted by restricting the claimant from any public interaction and from any tandem tasks with coworkers and/or supervisors; "intermittent" interactions with coworkers and supervisors commuted to occasional frequency in a workday; reduced sustained persistence and pace, as well as concentration, for work tasks accounted for in both simple instructions and in making only simple work-related decisions, as well as a restriction against any fast-paced production-rate pace work (*e.g.,* assembly-line work or jobs that require strict hourly production quotas); and "infrequent" changes readily adjusted to occasional changes within a routine work setting.

(Tr. 32-34) (bold in original) (underlining added). In a footnote, the ALJ further found as follows:

> While the undersigned acknowledges that the representative has submitted another disability claimant's Appeals Council decision—which had personally identifiable information redacted—the undersigned rejects the contention that the single decisionmaking Administrative Appeals Judge has, in that order of remand, set out a "definition" of superficial interaction that all Administrative Law Judges are bound to (*see* Ex. 23E).

(Tr. 34 n.2.)

Elsewhere in the decision, the ALJ reviewed the record evidence and noted findings inconsistent with disability, such as:

- "Mr. Clester has not alleged any frank difficulty getting along well with others, and to the contrary expressed interacting "fine" with authority figures . . . ."
- "He has been involved in some online dating and, in most recently documented psychiatric follow-up in March 2025, shared that he would soon travel to Florida to visit his daughter with an additional plan to meet up with his wife (separated) (*see* Ex. 8F/43,50,68,80). While anxious per the above-noted observations, he had maintained appropriate eye contact with the examining psychologist, who observed him to be behaviorally composed and appropriate, speaking at normal voice and rate without speed or pressure and, though mildly

aphasic, at average production, without irritability or instability of mood, and without any clinical signs of social phobia or panic disorder evident (Ex. 4F/4). His psychiatrist have noted his behavior as cooperative, readily engaged, conversant, without agitated or otherwise anxious-appearing motor activity level, and maintaining good eye contact (*see, e.g.,* Ex. 8F/7,14-15,31,45-46,51,63,75,81). These counterbalancing factors from his own activities and relationships and from the observations by mental health professionals show that his symptoms of social anxiety disorder, features of borderline personality disorder, and symptoms of other mental impairments cause significant, but not greater than moderate degree of limitation in the broad area of interacting with others."

- "Dr. Cayuso consistently observed fair attention span and concentration, intact recent and remote memory, linear and organized thought processes, calm and cooperative and readily engaged interpersonal behavior, average psychomotor activity level, and normal rate and volume of speech (Ex. 8F/7,14-15,22-23,31,38-39,45-46)."

- Clester "described social anxiety as 'manageable' on the medications and significantly benefitted by his pet dog, which he described as an 'emotional support animal' (Ex. 8F/12,28)."

(Tr. 20-21, 27.)

First, the ALJ considered the supportability and consistency of the state agency reviewing sources' opinions as required by the regulations. (*Id.* at 32-34.) To the extent the ALJ rejected the opinions for vagueness, there is no error. "Vagueness, or the failure to propose specific functional limitations, can be a reason to discount a medical opinion. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018)." *Springer v. Comm'r of Soc. Sec.*, Case No. 5:19 CV 2562, 2020 WL 9259707, at *9 (N.D. Ohio Oct. 8, 2020), *report and recommendation adopted* by 2021 WL 1015944 (N.D. Ohio Mar. 17, 2021). Furthermore, an ALJ may properly convert opined limitations into vocationally relevant terms. *See Lopez v. Comm'r of Soc. Sec.*, Case No. 1:22-CV-01801, 2024 WL 1580101, at *20 (N.D. Ohio Apr. 11, 2024) ("[R]eframing of limitations in medical opinions for clarity, sometimes described as 'convert[ing]' limitations 'into vocationally relevant terms in [a claimant's] RFC,' is not improper.") (citing *Modro v. Comm'r of Soc. Sec.*, No. 2:18-cv-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (additional citation omitted).

Second, Clester fails to show that there is a conflict between the state agency reviewing psychologists' opinion regarding superficial interaction and the RFC. As the Commissioner points out, this Court has found that a limitation to "no team or tandem tasks" accounts for a qualitative limitation on a claimant's ability to interact with others. *Duma-Quigley v. Comm'r*, 2023 WL 3016861, at *4. *See also e.g., Romo v. Comm'r of Soc. Sec.*, 2021 WL 5040385, at *7 (N.D. Ohio), *report and recommendation adopted by* 2021 WL 4437062 ("Here, since the ALJ limited Claimant to 'no tandem work', such a limitation prevents him from working alongside coworkers and supervisors. It logically follows then that the only interaction that Claimant would have with his coworkers and supervisors would be superficial."); *Kearns v. Comm'r of Soc. Sec.*, 2020 WL 2841707, at *12 (N.D. Ohio), *report and recommendation adopted by* 2020 WL 2839654 ("The ALJ's limitation to no team or tandem tasks is a qualitative limitation on social interaction and adequately addressed the opinion of Drs. Matyi and Finnerty that Kearns be limited to superficial interaction with others.").[4]

Furthermore, even assuming *arguendo* that there is a conflict between the state agency reviewing psychologists' opinion regarding superficial interaction and the RFC, the ALJ met his duty under SSR 96-8p by explaining why he did not adopt the state agency reviewing psychologists' opinion as to superficial interaction (Tr. 32-34), and that explanation is supported by substantial evidence.

There is no error.

---

[4] The Court notes that counsel for the claimant in *Duma-Quigley*, *Romo*, and *Kearns* is the same as counsel for Clester, and yet Clester's counsel failed to disclose this adverse authority to the Court. Ohio Rule of Professional Conduct 3.3(a)(2) prohibits an attorney from knowingly failing to disclose adverse authority, which is sanctionable conduct under Federal Rule of Civil Procedure 11. *See Dick's Sporting Goods, Inc. v. Boydston*, No. 2:14–cv–02360–JPM–dkv, 2015 WL 730072, at *4 n.1 (W.D. Tenn. Feb. 19, 2015). This is counsel's second such failure to disclose adverse authority. *See Bonifas v. Comm'r of Soc. Sec.*, Case No. 3:25-cv-02752-JJH, Doc. No. 8 (report and recommendation issued November 13, 2026). Any further failure by counsel to disclose adverse authority shall result in sanctions, up to and including a recommendation of dismissal.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: November 18, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**